Filed 3/18/16  P. v. Butler CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068137 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD252666) |
| STACY DON BUTLER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Daniel Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

The district attorney by amended information charged defendant and appellant Stacy Don Butler with intent to commit a sexual crime during the commission of a first degree burglary (Pen. Code, §§ 220, subd. (b) & 460; count 1); assault with intent to commit a sexual crime (Pen. Code, § 220, subd. (a); count 2); making a criminal threat (Pen. Code, § 422; count 3); assault with intent to commit a sexual crime (Pen. Code, § 220, subd. (a); count 4); and possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a); count 5). The amended information further alleged that counts 1 through 3 were committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)); that count 4 was committed on a minor (Pen. Code, § 220, subd. (a)(1)); and that defendant suffered six probation denial priors (Pen. Code, § 1203, subd. (e)(4)), two prison priors (Pen. Code, §§ 667.5, subd. (b) & 668) and two strike priors (Pen. Code,[1] §§ 667, subds. (b)-(i), 1170.12 & 668).

A jury found defendant guilty of all counts and found true the allegations that defendant committed count 3 for the benefit of a criminal street gang and that the victim of count 4 was under 18 years of age at the time of the offense. The jury, however, did not find the gang allegations true in connection with counts 1 and 2.

After dismissing one of his strikes, the court sentenced defendant to a determinate term of 33 years to be followed by a life sentence with a minimum term of 14 years. The court, pursuant to Proposition 47, reduced the drug offense in count 5 to a misdemeanor and deemed the sentence for that charge satisfied by time served.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

Defendant contends there is insufficient evidence in the record to support the true finding on the gang enhancement in connection with count 3. As we explain, we disagree and thus affirm his judgment of conviction.

FACTUAL AND PROCEDURAL OVERVIEW

Victim Amanda R. testified she was 19 years old in June 2010 and was then living with a roommate and her roommate's daughter in a duplex located in the Lincoln Park neighborhood of San Diego. Amanda had grown up in the area near Lincoln Park and, thus, was familiar with the Lincoln Park criminal street gang that operated in the community.

On June 30, 2010, Amanda made plans for her friend Clarence Carllel to come over and watch a movie. At the time, Amanda was babysitting her roommate's daughter while her roommate worked. Amanda knew that Carllel associated with Lincoln Park gang members and that he went by the moniker "Mack 50." Carllel, two other individuals and defendant arrived at Amanda's home in the early afternoon. Amanda previously had met the two other individuals and knew they also associated with the Lincoln Park gang.

Amanda testified defendant looked familiar, but she was unsure whether she had met him before June 30. In any event, defendant introduced himself to Amanda and said his name was "Reddish." Amanda noted defendant was wearing green shoes and a predominately green shirt. Amanda knew Lincoln Park gang members often wore green.

Amanda testified that defendant then did not appear under the influence or otherwise act unusual. However, after they started watching a movie, defendant asked to

3

use the bathroom. Once alone inside the bathroom, Amanda could hear defendant repeatedly screaming, " 'Fuck you, blood. I'm going to kill you.' " Amanda estimated defendant continued to scream inside the bathroom for about three to five minutes.

While defendant was alone inside the bathroom screaming, Amanda asked the others whether they should check on defendant. In response, one of the individuals told Amanda that defendant was "crazy" and that "he would be okay." When defendant returned to the living room, he seemed "normal" to Amanda. However, over the next 45 minutes to an hour, Amanda estimated defendant returned to the bathroom about five more times, and, each time he went inside, he screamed, " 'I'm going to fuckin' kill you, blood.' " As before, defendant acted "normal" when he came out of the bathroom.

At one point, when he came back to the living room, defendant asked Amanda if he could spend the night at her home, claiming he was homeless. Amanda refused. Defendant next started to flirt with Amanda, telling her she was "bad," which Amanda interpreted to mean "good looking." After hanging out for about 45 minutes to an hour, the four men went outside to smoke cigars. Before they went outside, Amanda's roommate came home and left with her daughter to go to the store.

Amanda testified she asked Carllel to take his friends outside because she did not want them smoking inside and because she was "uncomfortable" by defendant's behavior inside the bathroom. Amanda testified she also went outside with the group and stayed long enough to take "maybe . . . two hits" from a cigar. Amanda denied they were smoking anything other than tobacco. Amanda next told Carllel she was going back inside because she had to get ready for work.

4

Although Amanda closed the gate leading to her home, she did not shut the front door. Amanda testified that when standing outside the gate looking back toward her home, it was not even possible to see the front door. In any event, Amanda did not believe anyone from the group would be coming back inside. Amanda went into the bathroom to get ready for work.

About five minutes later, while still in the bathroom, Amanda heard the outside gate "slam." Amanda assumed her roommate and her roommate's daughter were returning from the store. However, when Amanda poked her head out of the bathroom, she saw defendant standing in front of her. Amanda described defendant's appearance as "nervous." Defendant said nothing. Amanda became scared, particularly because of defendant's earlier behavior.

Amanda saw defendant look outside. She testified he next suddenly "rush[ed]" toward her, and, using "extreme force," he grabbed her and pulled down her sweatpants and underwear past her knees. Using a closed fist, defendant then starting punching her in the face as he pushed her back into the bathroom. Amanda estimated defendant punched in her the face and head about four or five times. One of the punches knocked her down, causing her to fall into the bathtub. While defendant was punching Amanda, he repeated, "Shut the fuck up, bitch."

Amanda testified defendant closed the bathroom door and then used his legs as leverage to keep the door closed while he continued his attack. Amanda fought back. She used her feet to kick defendant as she lay in the bathtub. In addition, she screamed

5

for help. All the while, defendant continued to reach for her pants. Amanda noticed defendant's pants also were partially down, exposing his boxer underwear.

Amanda was still in the bathtub when Carllel came into the bathroom. Amanda was crying and "screaming hysterical[ly]." Carllel pulled defendant back, as defendant was "hunch[ed] over" Amanda. Amanda told Carllel that defendant had tried to rape her. Defendant responded that Amanda was lying and that she had hit him. Carllel then asked defendant why Amanda's pants were down. Carllel next forcefully pushed defendant out of the bathroom and told defendant, " 'You need to go. You got to go.' "

As defendant was being forcefully escorted from the home, he *repeatedly* yelled that he was going to come back and "kill [Amanda]"; that he " 'kn[e]w where [she] live[d], bitch' "; *and* that " '[t]his is on Lincoln.' " As defendant was making these statements, he made his hand resemble a gun, with one of his fingers pointing towards Amanda. Amanda testified defendant's statements that "[t]his [was] on Lincoln" meant he would back up his threats to come back and kill her. Terrified from the attack, from his references to the Lincoln Park gang and from his threats of returning and killing her, Amanda decided to leave her home that same day.

Amanda knew the Lincoln Park gang had committed other crimes and had used weapons on occasion. Amanda also knew that victims and/or witnesses of crimes committed by Lincoln Park gang members who cooperated with law enforcement or "snitch[ed]" on the gang sometimes ended up dead. In fact, Amanda personally had "seen people die" as a result.

6

After defendant left, Amanda called her foster mother, who advised Amanda to report the incident to police. Because Amanda took defendant's threats "very seriously," she initially refused. Amanda testified she was afraid that if she notified police, defendant would make good on his threats and harm not only her but perhaps her roommate's daughter. However, Amanda finally agreed to call the police after her mother insisted.

Carllel waited with Amanda for the police to arrive. The two other individuals, who earlier had been at her home, stood watching across the street. While waiting for the police, Amanda asked Carllel if he would "beat up" defendant for what he had done to her. Carllel told Amanda that he could not "because of [defendant's] older homies" and that if he took matters into his own hands, he "would be disciplined and dealt with."

Amanda testified she gave a statement to the police. At the time, Amanda did not believe the officer took her seriously. Although Amanda had "welts" on her face and head from the attack, according to Amanda the officer did not take any pictures. Amanda declined medical treatment because, although she was emotionally shaken, she was not physically injured. The officer advised Amanda that in light of defendant's statements, it was in her "best interest" to move out of the home.

The day after the attack, Amanda was interviewed by a detective. During the interview, Amanda told the detective not to involve her friend Carllel because he would not be cooperative. When the detective inquired, Amanda stated she had received a call from Carllel's aunt, who said "there was no way [Amanda] was going to turn her nephew into a snitch and that he would not help."

7

The detective showed Amanda a six-pack photo array. Amanda identified defendant in one of the photos as her attacker, which identification Amanda confirmed in court. Amanda subsequently learned that defendant's father was also an active member of Lincoln Park and that defendant was trying to "live up to his father's name." This information caused Amanda to become even more scared of defendant and the gang.

San Diego Police Detective Rudy Castro testified as the People's gang expert. Castro testified that, when he was a uniformed officer, he worked for five years in the gang suppression unit; that, as a uniformed officer, he investigated gang-related crimes such as robberies, shootings, and stabbings, including those committed by the Lincoln Park street gang; and that, for the last four years, he has been working solely on cases involving the Lincoln Park street gang. Castro noted that, even before he worked in the gang suppression unit, for many years he patrolled the streets in southeastern San Diego, where most of the gangs—including Lincoln Park—operated. Castro estimated he had been involved in about 1,000 gang-related cases since joining the police force.

Castro estimated that, in 2010, Lincoln Park had at least 400 documented gang members. In February 2015 (i.e., the time of trial), Castro stated there were 453 members of Lincoln Park. Castro noted that, in 2010, the Lincoln Park gang also had associate or affiliate members, which he defined as people that want to be in the gang or have an interest in the gang but who have not yet met the criteria to become a member of the gang. Castro also noted that Lincoln Park was a "blood" gang, in contrast to a "crips" gang; that, as such, members of Lincoln Park typically wore red; and that members of the Lincoln Park gang also wore green to identify themselves, as that was the color used by

8

the local high school. Castro opined that when Lincoln Park gang members wore red and/or green, "everybody" in their community knew they were affiliated with that particular gang.

With respect to the attack that occurred on June 30, 2010, Castro testified that the duplex where Amanda was then living was in fact within the Lincoln Park gang territory; that Castro knew defendant back when Castro was working in the gang suppression unit; that defendant was first documented as a member of the Lincoln Park gang in February 2002; that defendant's father was also a member of the Lincoln Park gang; that defendant's father went by the moniker "Big Soft"; and that because defendant's father was already well known in the gang, it was much easier for defendant to join the gang. In investigating cases involving the Lincoln Park gang, Castro estimated that about "95 percent" of the time people in the community will not cooperate with law enforcement and that those who do cooperate will be labeled a "snitch" or a "rat" and retaliated against by the gang.

Castro prepared a gang documentation report in connection with the June 30 incident. Castro testified that defendant's gang moniker was "Little Soft," although defendant was also known as "Little Stay Soft" and "Baby Soft"; that at the time of the attack on Amanda, defendant's father had a great deal of respect in the neighborhood; that to achieve such lofty status, a gang member like "Big Soft" must have committed "copious amounts of different crimes, violent crimes for the benefit of the street gang as well as never cooperating with law enforcement"; that once such gang members achieve this lofty status, they have the clout of an "O.G. or an old gangster," which is the utmost

9

respect in a gang; and that the "young homies, the new kids coming in, they see that [respect], and they want to emulate that."

The record shows the prosecutor presented Castro with the following hypothetical: "If I were to tell you that a female who associated with Lincoln Park gang members was in her bathroom when a well-known Lincoln Park gang member marched in, rushed her and hit her several times and tried to pull at her pants and sexually assault her, do you have an opinion, detective, as to whether or not that crime would, in fact, benefit the criminal street gang Lincoln Park?"

In response to this hypothetical, Castro opined the crime would "benefit" the Lincoln Park gang, noting: "The victim knowing that that person is a gang member, knowing the type of crimes they are involved in, that individual or the suspect would feel invincible, that he could do what he wants when he wants and knowing that she won't testify against him. That's what these gangs thrive on is that fear and intimidation. Knowing that she won't cooperate or figuring she won't cooperate will just let him do what he wants whenever he feels fit to do it." Castro further opined that the gang member that committed the crime in the (above) hypothetical would have his reputation enhanced as a result and would instill fear in the community.

The record shows the prosecutor next asked Castro if the Lincoln Park gang would be benefited under the same (above) hypothetical if the known gang member yelled to the victim "this is on Lincoln Park gang" after the attack. Castro opined that referencing the Lincoln Park gang would "definitely benefit the gang" because even though the victim in the hypothetical already knew her attacker was a member of Lincoln Park, his "putting

10

his name behind the gang . . . raises the fear factor even more" in the victim and in the community.

The record shows the prosecutor next asked Castro if the Lincoln Park gang would be benefited in the same (above) hypothetical if the known gang member, as he was leaving, said he "was going to come back and kill [the victim] for lying."  Castro opined that such a statement also would benefit the gang because "that statement alone shows that he is trying to intimidate [the victim] from cooperating with law enforcement.  That's just huge.  If these guys are able to get away with it, there would be a lot more crime being involved with gang members."

Lastly, the prosecutor asked Castro if the Lincoln Park gang would be benefited in the same (above) hypothetical if an associate or affiliate of that gang told the victim that he could not go after her attacker "because of who he [i.e., the attacker] is, because of his older homie."  Castro opined that the gang would in fact be benefited under this hypothetical as well, noting:  "It tells you right there [that] there is another affiliate saying to the victim, [']I can't do anything given this guy's [i.e., the attacker's] reputation.[']  It furthers the gang.  It promotes the gang as well.  It is just showing what these gang members are all about.  There [are] rules that they have to follow.  And if they break those rules, there [are] repercussions for it."[2]

---

2    We note counts 4 and 5 stemmed from an incident involving Cynthia, then 17 years old.  Defendant in early December 2013 grabbed Cynthia and attempted to pull down her pants as she was doing laundry.  When the police subsequently arrested defendant for the assault of Cynthia, they found three vials of PCP in defendant's pocket. Defendant's has not raised any issues on appeal regarding counts 4 and 5.

11

DISCUSSION

I.

We review the sufficiency of the evidence to support a gang enhancement under the same standard we apply to a conviction. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) We examine the record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a jury could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576, 578.) We must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence (*People v. Kraft* (2000) 23 Cal.4th 978, 1053), and we will not reverse unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict" (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429). We do "not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses" when determining whether substantial evidence supports a conviction. (See *People v. Little* (2004) 115 Cal.App.4th 766, 771.)

Section 186.22, subdivision (b)(1) prescribes a sentencing enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." A gang enhancement under this statute contains two distinct prongs. (*People v. Albillar* (2010) 51 Cal.4th 47, 59.) The first prong requires a finding that the crime was "gang related" in the sense of being for the benefit of, at the direction of, or in association with a gang. (*Id.* at p. 60.) The second

12

"specific intent" prong requires "only the specific intent to promote, further, or assist criminal conduct by *gang members* " (*id.* at p. 67) and "applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced" (*id.* at p. 66).

A jury may rely on expert testimony about gang culture and habits to reach a true finding on a gang-enhancement allegation. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.) However, an expert's testimony "alone" is insufficient evidence from which a jury may reach a verdict on a gang-related offense or, as in the instant case, make a finding on a gang enhancement. (See *id.* at p. 931.) Instead, there must be some " 'evidentiary support [in the record] other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.' " (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.)

II.

Here, we conclude there is substantial evidence in the record to support the finding that defendant threatened Amanda for the "benefit" of the Lincoln Park gang. (See § 186.22, subd. (b)(1).) Indeed, the record shows Amanda told her friend Carllel that defendant tried to rape her, after defendant rushed into the bathroom, pulled down her pants and underwear, and repeatedly punched her in the face and head. The record further shows defendant denied trying to rape Amanda, instead accusing her of lying and stating she was the aggressor. As Carllel forcefully escorted defendant out of Amanda's bathroom and home, the record shows defendant *repeatedly* stated that he was going to

13

come back and kill her; that he knew where the "bitch" lived; and perhaps most importantly for purposes of our issue, that "[t]his [was] on Lincoln." As defendant was loudly making these threatening statements, the record shows he made his hand resemble a gun and pointed towards Amanda.

The record shows Detective Castro relied on these evidentiary facts to opine that defendant's repeated threats to return and kill Amanda, and his repeated references to the Lincoln Park gang while making such threats, benefited the gang. He testified that, like most criminal street gangs, the Lincoln Park gang used "fear and intimidation" to prevent victims and/or witnesses of crime from cooperating with law enforcement. In fact, he estimated that in 95 percent of the hundreds of gang cases he has worked on—including involving the Lincoln Park gang—witnesses and/or victims have refused to cooperate with law enforcement.

Detective Castro testified lack of cooperation with law enforcement benefits the Lincoln Park gang because gang members are able to commit crimes that go unprosecuted. This point was driven home in the instant case. After the attack, Amanda called her mother and told her what had happened. The record shows that Amanda initially told her mother she was *not* going to report the attack to police because she was terrified defendant would return and harm her and/or her roommate's daughter. The record further shows Amanda changed her mind and agreed to notify police of the attack *only* after her mother threatened to do so if Amanda refused.

In light of the evidence of defendant's repeated references to Lincoln Park as he was threatening to return and kill Amanda for allegedly "lying" about the attempted rape;

14

the evidence of Amanda's fear of retaliation both by defendant, whom she knew to be a member of the Lincoln Park gang, and by the gang itself, in light of her growing up in the community where the gang operated and her knowledge of what happens to a person (i.e., a "snitch") who cooperates with law enforcement; and the expert testimony of Detective Castro, who, in relying on such evidence, opined the Lincoln Park gang benefited from defendant's criminal threat because it instilled fear in Amanda and in the community in which the gang operated, we conclude there is ample evidence in the record to support the finding that defendant committed count 3, making a criminal threat (see § 422), for the "benefit" of the Lincoln Park gang as provided in subdivision (b)(1) of section 186.22.

In reaching our decision, we reject defendant's contention there allegedly was no connection between his threats to kill her and his accusation she was lying about the attempted rape. Our own independent review of the record shows otherwise, as Amanda testified at the same time defendant was threatening to return and kill her he not only was accusing her of lying, but he also was repeatedly referencing the Lincoln Park gang while using his hand to resemble a gun. In our view, this contention by defendant borders on the frivolous.

Finally, we note defendant's various other contentions on this particular issue essentially ask us to reweigh the evidence and the credibility of witnesses and make a new finding, which we cannot do under a substantial evidence standard of review. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 27 [noting the general rule that "[i]f the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is

15

not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding"].)

III.

Defendant also contends the evidence is insufficient to support the "specific intent" prong of section 186.22, subdivision (b)(1). We disagree.

As noted *ante*, the second prong of this enhancement requires "only the specific intent to promote, further, or assist criminal conduct by *gang members*" (*People v. Albillar*, *supra*, 51 Cal.4th at p. 67) and "applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced" (*id.* at p. 66).

Here, because the specific intent required under subdivision (b)(1) of section 186.22 is to "promote, further, or assist in *any* criminal conduct by gang members" (italics added), we conclude defendant's own criminal threat qualified as the gang-related criminal activity. (See *People v. Hill* (2006) 142 Cal.App.4th 770, 773-774 [noting the defendant's criminal threat against the victim and his reference to a "crips" gang, after the victim allegedly had "disrespected" him following a minor car accident, satisfied the second prong of subdivision (b)(1) of section 186.22 because the threat was evidence of "any" criminal conduct by a gang member for purposes of this statute and, thus, "[n]o further evidence on this element was necessary"].)

Our conclusion on this issue is buttressed by the fact that when defendant threatened Amanda, he also repeatedly referenced the Lincoln Park gang. In light of such direct evidence, we conclude there is ample evidence in the record to support a finding

16

defendant possessed the requisite specific intent to enable or promote *any* criminal

conduct by the gang.  (See § 186.22, subd. (b)(1).)

## DISPOSITION

The judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


O'ROURKE, J.